**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **VALDEZ LAMONT JORDAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 3:22-CV-3041-MAB** |
| | ) | |
| **MELISSA WISE and** | ) | |
| **CARISSA LUKING,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM AND ORDER**</u>

**BEATTY, Magistrate Judge:**

This matter is currently before the Court on the motion for summary judgment on the issue of exhaustion filed by Defendants Carissa Luking and Melissa Wise (Doc. 48; *see also* Doc. 49), as well as Plaintiff's motion for leave to file a second amended complaint (Doc. 68). For the reasons explained below, Defendants' motion for summary judgment is granted and Plaintiff's motion for leave to file a second amended complaint is denied.

<u>BACKGROUND</u>

Plaintiff Valdez Lamont Jordan, an inmate of the Illinois Department of Corrections, brought this civil action pursuant to 42 U.S.C. § 1983 for violations of his constitutional rights at Lawrence Correctional Center in the form of delayed or deficient medical care (Doc. 15). Plaintiff alleged that prison officials violated his First, Eighth, and Fourteenth Amendment rights through a wide-variety of actions all related to Plaintiff's refusal to sign a consent form for Covid-19 saliva testing or related to their handling of other medical issues (*see* Doc. 19, pp. 2–8). The original complaint was filed on December

22, 2022, but dismissed because it violated Federal Rules of Civil Procedure 8, 18, and 20 in that it was extremely lengthy, the allegations were disjointed and poorly organized, and he joined many unrelated claims and parties in a single lawsuit (Doc. 11). Plaintiff filed a first amended complaint on May 31, 2023 (Doc. 15), which was screened pursuant to 28 U.S.C. § 1915A (Doc. 19). Plaintiff was permitted to proceed on an Eighth Amendment deliberate indifference claim against Carissa Luking and Melissa Wise, who are both licensed nurse practitioners, related to their treatment of Plaintiff's chronic pains and ailments between May 2022 and April 2023 (Doc. 19, pp. 8, 16–17; *see also* Doc. 65, p. 2).

Specifically, Plaintiff alleged that an MRI in February 2022 detected mild- to severe-spinal injuries, and foreign objects in his left thigh (Doc. 19, p. 4). Two months later, he received injections at an outside facility to reduce/stop the pain in his back (*Id.*). The injections, however, did not seem to help or caused more pain. He sought medical care in May 2022 for his severe back and leg pain and was sent to the emergency room on May 12th (*Id.* at pp. 4–5). On May 18th, Defendants Wise and Luking saw Plaintiff at the prison to follow-up on his emergency room visit (*Id.* at p. 5; *see also* Doc. 15, p. 12). They ordered multiple blood tests, an EKG, and an ultrasound for a mass on Plaintiff's head. (*Id.* at p. 5). They saw him again the next day to review test results (*Id.*). They were concerned the mass on Plaintiff's head was causing multiple problems, so Luking directed Wise to schedule an MRI (*Id.*).

Plaintiff was seen at an outside specialist on June 2, 2022, for his ongoing back problems (Doc. 19, p. 5). The specialist opined further injections would not help and

recommended a consultation with a neurosurgeon for possible spine surgery (*Id.*). On June 3rd, Wise reviewed Plaintiff's chart and recommended further evaluation, including a CAT scan (*Id.*). On June 13th, Luking followed-up with Plaintiff about the specialist visit (*Id.*). She issued slow walk, low gallery, and low bunk permits; she ordered a medication; and she recommended an urgent neurosurgery consult (*Id.*). On June 24th, Plaintiff underwent the MRI on his head (*Id.*). Days later, Luking and Wise followed up with Plaintiff and referred him for a neurosurgery consultation, a biopsy for the mass on his head, and physical therapy for his back (*Id.*).

In late July of 2022, Plaintiff developed throat pain and he was seen on nurse sick call, and then by Wise and Luking (Doc. 19, p. 5). They believed his lymph nodes were enlarged, so Wise ordered a blood test and they discussed antibiotics (*Id.*). Plaintiff declined antibiotics but agreed to the blood test. Plaintiff's blood was drawn on August 4th, and on August 8th, Luking told him that it showed certain values were out of normal range (*Id.*). Plaintiff followed up with Wise via a written request about his blood test results and her suggestion of antibiotics (*Id.* at pp. 5–6).

Meanwhile, twice in August of 2022, Plaintiff was refused physical therapy for his back because he had not signed the form consenting to covid testing via a saliva sample (Doc. 19, p. 6). On September 1, 2022, Plaintiff filed an emergency grievance about his desire for treatment for his back and leg pain and his persistent throat pain (*Id.*). And between September 5, 2022, and January 30, 2023, he submitted approximately 17 request slips to be seen by medical professionals and was only seen twice in October 2022: once for a skin cream and once for his persistent pain (*Id.*). Other appointments were refused

or canceled because Plaintiff had not signed the Covid consent form (*Id.*).

Plaintiff was seen on February 3, 2023, by a nurse and on Feb. 6th by Wise (Doc. 19, p. 7). Plaintiff reported to Wise and Luking that his pain was getting worse (*Id.*).   Wise put in an order for a throat swab, as well as blood and stool tests (*Id.*). Plaintiff was seen by nurses for complaints with his chronic issues again in February and twice in March (*Id.*). On April 11, 2023, Plaintiff saw Luking, who discovered that the tests she had ordered back in February had never been performed due to a nurse's error (*Id.*). the tests were performed eight days later on April 19th (*Id.*). Luking also confirmed to Plaintiff that he was still approved for medical writs to see a neurosurgeon, for a biopsy of the mass on his head, and to see an ear, nose and throat specialist (*Id.*). Before those appointments occurred, however, Plaintiff was transferred from Lawrence to Pinckneyville on April 27, 2023 (*Id.*).

On May 10, 2023, a nurse practitioner at Pinckneyville told him that his labs from April showed helicobacter pylori, which Plaintiff alleges was the cause of his throat pain (Doc. 19, p. 7). He alleges Luking and Wise failed to provide treatment for his helicobacter pylori, which caused months of unnecessary throat pain (*Id.*). Plaintiff asked about physical therapy, and he was informed there was a 3-month waitlist (*Id.*). He also inquired about the status of the medical writs for specialist treatment and was told the appointments would be at the discretion of Pinckneyville's medical coordinator (*Id.* at pp. 7–8).

The Court's understanding of Plaintiff's allegations was that he was claiming Luking and Wise either failed to provide needed follow-up care, or they delayed the

provision of his care (Doc. 19, p. 17). For example, Wise ordered tests related to his throat pain on February 6, 2023, but they were not performed until April 19, 2023. He also had to repeatedly seek care for the same issues, and sometimes he was not allowed to go out on medical writs because of the Covid test consent issue (*Id.*). And, in June of 2022, Wise and Luking apparently thought that he needed a biopsy and an urgent neurosurgery consultation, but neither of those had occurred by late April 2023, when he was transferred to Pinckneyville (*Id.*). Plaintiff ultimately alleges that Wise and Luking failed to diagnose or provide treatment for his throat issue, and they failed to ensure specialist visits for his spine neurosurgery consult, the mass on his head, or an ear nose and throat specialist (*Id.*).

Defendants Luking and Wise filed their motion for summary judgment on the issue of exhaustion on May 10, 2024 (Doc. 48; *see also* Docs. 49, 50). Defendants submitted as evidence approximately 200 pages of grievance records from the ARB (Docs. 49-1, 49-2), approximately 200 pages of grievance records from Pinckneyville (Doc. 49-3, 49-4), Plaintiff's movement history from Pinckneyville (Doc. 49-5), and a log of the grievances that Plaintiff submitted at Lawrence (Doc. 49-6). Plaintiff was given a number of extensions of time to file his response so that he could obtain his medical records, which he said were necessary to respond (Docs. 53, 55, 63). Plaintiff filed his response in October 2024 (Doc. 64). Defendants then filed a reply on October 2, 2024 (Doc. 65).

After the summary judgment briefing was complete, Plaintiff filed a motion for leave to amend his complaint (Doc. 68). Defendants did not file a response.

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF EXHAUSTION

Summary judgment is proper only if the movant shows that there is no genuine issue as to any material fact and they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In making that determination, the court must view the evidence in the light most favorable to, and draw all reasonable inferences in favor of, the nonmoving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

Courts generally cannot resolve factual disputes on a motion for summary judgment. *E.g., Tolan v. Cotton*, 572 U.S. 650, 656 (2014) ("[A] judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.") (internal quotation marks and citation omitted). However, when the motion for summary judgment pertains to a prisoner's failure to exhaust, the Seventh Circuit has held that disputed factual questions can and should be resolved by the judge (rather than a jury) as a preliminary matter in an evidentiary hearing known as a "*Pavey* hearing." *Smallwood v. Williams*, 59 F.4th 306, 315 (7th Cir. 2023) (citing *Pavey v. Conley*, 544 F.3d 739, 742 (7th Cir. 2008)). *Accord Wagoner v. Lemmon*, 778 F.3d 586, 590 (7th Cir. 2015); *Roberts v. Neal*, 745 F.3d 232, 234 (7th Cir. 2014). But when a prisoner does not raise sufficient factual allegations to demonstrate a genuine dispute of material fact, then no evidentiary hearing is necessary. *Jackson v. Esser*, 105 F.4th 948, 957 (7th Cir. 2024) (citing *Smallwood*, 59 F.4th at 318). After reviewing both parties' briefs, the Court has determined that there are no genuine issues of material fact, and a hearing is not necessary.

## Discussion

The Prison Litigation Reform Act provides that a prisoner may not bring a lawsuit about prison conditions unless and until he has exhausted all available administrative remedies. 42 U.S.C. § 1997e(a); *Pavey v. Conley*, 663 F.3d 899, 903 (7th Cir. 2011). Exhaustion is an affirmative defense, which the defendants bear the burden of proving. *Pavey*, 663 F.3d at 903 (citations omitted). In order for a prisoner to properly exhaust his or her administrative remedies, the prisoner must "file complaints and appeals in the place, and at the time, the prison's administrative rules require." *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002); *see also Woodford v. Ngo*, 548 U.S. 81, 90 (2006). Failure to do so means failure to exhaust. *Riccardo v. Rausch*, 375 F.3d 521, 524 (7th Cir. 2004).

As an inmate in the IDOC, Plaintiff was required to follow the grievance process outlined in the Illinois Administrative Code to exhaust his claims. 20 ILL. ADMIN. CODE § 504.800, *et seq*. (2017). There is no dispute that the grievances at issue all went through every step of the grievance process (*see* Doc. 49). The issues here pertain to the timing of the grievances and/or whether the content of the grievances was sufficient to cover the claim in this case (*see id.*). The administrative regulations require, in pertinent part, that a grievance must be filed "within 60 days after the discovery of the incident, occurrence or problem that gives rise to the grievance." 20 ILL. ADMIN. CODE § 504.810(a). The regulations also require that a prisoner's grievance "contain factual details regarding each aspect of the offender's complaint, including . . . the name of each person who is the subject of or who is otherwise involved in the complaint," or, if their name is unknown, "as much descriptive information about the individual as possible." 20 ILL. ADMIN. CODE

§ 504.810(c). The grievance forms used by Plaintiff likewise asked for "the name or identifying information for each person involved" (*see, e.g.*, Doc. 49-1, p. 84). In short, the grievance must provide sufficient information to identify the defendant as the target of the complaint or to implicate them in the alleged wrongdoing. *See Roberts v. Neal*, 745 F.3d 232, 234 (7th Cir. 2014) (explaining "fatal defect" in grievance was "the absence of anything in it to indicate that [the defendant] was the target."); *see also Ward v. Hoffman*, 670 Fed. Appx. 408, 410 (7th Cir. 2016) (affirming summary judgment based on prisoner's failure to exhaust where he complained only about the procedures used by the adjustment committee and did not mention excessive force or the defendants); *Ambrose v. Godinez, 510 Fed. Appx.* 470, 472 (7th Cir. 2013) (affirming the dismissal of prison officials where the plaintiff's grievance failed to mention the officials by name or otherwise implicate them in the alleged constitutional violation).

Defendants contend that Plaintiff submitted four grievances related to the allegations in his amended complaint (Doc. 49, p. 5; *see also id.* at pp. 5–7, 12–16). Plaintiff asserts there are three additional grievances relevant to the issue of exhaustion (Doc. 64, p. 4). However, he seemingly admits that all of the grievances at issue were really about prison officials' efforts to coerce him into signing the form consenting to covid testing via a saliva sample (Doc. 64, p. 2) ("Numerous grievances were submitted . . . all relating to the same event of a continuing violation of efforts to coerce [him] into signing their form."). In other words, Plaintiff seems to concede that the grievances were not about anything that he thought Defendants Luking and Wise had done wrong in providing medical care to him. Plaintiff's other arguments primarily focus on the merits of the

grievance responses and whether the statements made by prison officials in the responses were true (*see* Doc. 64). He says very little, if anything, about why or how the grievances cover his allegations against NPs Luking and Wise (*see id.*).

The Court has nevertheless examined all seven of the grievances highlighted by the parties. Each is discussed in turn below. The Court's analysis of each grievance focuses on whether Plaintiff fully exhausted his administrative remedies prior to filing his amended complaint on May 31, 2023 (as opposed to the original complaint), because that is the position Defendants took in their motion for summary judgment (*see* Doc. 49).

## A. Grievances #05-22-010 and #07-22-129

The first two grievances that Plaintiff claims are relevant are grievance #05-22-010 dated May 4, 2022, and grievance #07-22-129 dated July 12, 2022 (Doc. 64, pp. 4, 5; *see* Doc. 49-2, pp. 31–35; 105–11). In these grievances, Plaintiff complains about being placed in quarantine, and the restrictions that result from that placement, because he will not consent to being tested for covid by submitting a saliva sample (Doc. 49-2, pp. 34–35, 109–10). There is nothing in the grievances that suggests NPs Luking and Wise had anything to do with the covid testing requirements or the quarantine procedures, nor are there any allegations in the amended complaint to that effect (*see* Doc. 15). Plaintiff was not permitted to proceed on any claims related to the covid testing requirements and quarantine procedures, and his claim against NPs Luking and Wise is based entirely on conduct separate and apart from those requirements and procedures (*see* Doc. 19). Accordingly, these two grievances are simply not relevant to the matter at hand and do not demonstrate the existence of an issue of fact as to whether Plaintiff exhausted his

claim against NPs Luking and Wise.

## B. Emergency Grievance #09-22-047

The next grievance at issue is emergency grievance #09-22-047 dated September 1, 2022 (Doc. 49, pp. 5–6, 12–13; Doc. 64, p. 6; *see also* Doc. 49-1, pp. 112–17). There is no dispute that this grievance was fully exhausted in that it went through every step of the grievance process and was rejected on the merits (*see* Doc. 49, pp. 5–6, 12–13; *see also* Doc. 49-1, pp. 112–17). In this grievance, Plaintiff described the "serious" pain that he was experiencing in his lower back and leg and asked for certain things, including immediate medical attention from a doctor, for physical therapy, for a cane or walker, for regular exercise, for fresh air and sunlight, and for certain vitamins/supplements (Doc. 49-1, pp. 114–15). He attached additional pages to the grievance after getting responses from the counselor and the grievance officer (*Id.* at pp. 116–17). He explains that he has tried to be seen for the issues described in the grievance, but he has not been allowed to start physical therapy, his call passes have been canceled, and he has not been taken on scheduled medical furloughs all because he refuses to sign the form consenting to covid testing (*Id.*).

The Court agrees with Defendants that this this grievance is insufficient to exhaust any part of Plaintiff's claim in this lawsuit against NPs Luking and Wise. The crux of the grievance is that Plaintiff is being denied medical care because he will not sign the form consenting to saliva testing for covid. Once again, there is nothing in the grievances that suggests NPs Luking and Wise had anything to do with the covid testing requirements, the quarantine procedures, or the resulting restrictions, nor are there any allegations in

the amended complaint to that effect (*see* Doc. 15). Plaintiff was not permitted to proceed on any claims related to the covid testing requirements and quarantine procedures, and his claim against NPs Luking and Wise is based entirely on conduct separate and apart from those requirements and procedures (*see* Doc. 19). Plaintiff did not mention a nurse practitioner in the grievance, let alone reference NPs Luking and Wise by name, title, description, or otherwise identify them as the target of the grievance. Plaintiff also did not complain about any of the medical care that he had received from NPs Luking and Wise. Therefore, this grievance did not serve to put prison officials on notice of any purported problem with the medical care that NPs Luking and Wise had provided (or failed to provide) to Plaintiff and thus cannot serve to exhaust Plaintiff's claim against them in this lawsuit. *See Schillinger v. Kiley*, 954 F.3d 990, 995 (7th Cir. 2020) (noting that the purpose of exhaustion is to give "a prison 'notice of, and on opportunity to correct, a problem.'" (quoting *Turley v. Rednour*, 729 F.3d 645, 650 (7th Cir. 2013))).

## C.  Grievance #09-22-169

Plaintiff next points to grievance #09-22-169 dated September 25, 2022 (Doc. 64, p. 7; *see also* Doc. 49-1, pp. 17–25). In this grievance, Plaintiff complains about his placement in "quarantine," where he claims he is being treated the same as prisoners in restrictive housing/segregation (Doc. 49-1, pp. 23–24). This grievance is wholly unrelated to Plaintiff's claim against NP Luking and Wise. There is not mention of either of them nor is there any reference to any of the medical care they had provided to Plaintiff. Therefore, it cannot serve to exhaust Plaintiff's claim against NPs Luking and Wise in this lawsuit.

**D. Grievance # 01-23-074**

The next grievance at issue is grievance # 01-23-074 dated December 27, 2022 (Doc. 49, pp. 6, 13–14; Doc. 64, pp. 7–8; *see also* Doc. 49-1, pp. 75–81).[1] There is no dispute that this grievance was fully exhausted in that it went through every step of the grievance process and was rejected on the merits (*see* Doc. 49, pp. 6, 13–14; *see also* Doc. 49-1, pp. 75–81). In this grievance, Plaintiff complains about various issues/incidents (*see* Doc. 49-1, pp. 79–80). The only one pertinent to this lawsuit is Plaintiff's complaint regarding the biopsy of the mass on his head. Plaintiff stated that he was scheduled to go on a medical writ for the biopsy on December 21, 2022. While he was in the Health Care Unit waiting to leave on the writ, he was asked by a correctional officer to sign a liability waiver. He was told that he would not be able to go on the writ if he did not sign. Plaintiff refused to sign the form and was taken back to his housing unit. He claims that he was not taken out on the medical writ in retaliation for not signing the waiver. He also claims that denying him the treatment he was to receive on the medical writ violates Illinois statute, the Constitution, IDOC and Wexford policies, and the *Lippert* consent decree.

The Court finds that this grievance is insufficient to exhaust any part of his claim against NPs Luking and Wise for the same reasons as the previous grievance. Plaintiff did not specifically reference NPs Luking and Wise by name, title, description, or

---

[1] The date at the top of the grievance is partially obscured by a stamp indicating the grievance had been received by the grievance office on January 10, 2023 (*see* Doc. 49-1, p. 79). The only part of the date that is visible is the word "December" (*see id.*). However, Plaintiff's signature at the bottom of the grievance is dated December 27, 2022 (*see id.*). The Court will assume, for purposes of this Order, that the grievance was likewise dated December 27, 2022 because, in this instance, the exact date of the grievance is immaterial to the issue of whether Plaintiff exhausted his administrative remedies.

otherwise identify them in any way as the target of the grievance. Nor did Plaintiff complain about any of the care that he had received from them. His complaint was solely about the fact that he was not sent out for a biopsy of his head because he would not sign a waiver. But there is nothing in the grievance that suggests this conduct can be imputed to NP Luking or Wise, nor are there any allegations in the amended complaint to that effect. Accordingly, this grievance cannot serve to exhaust Plaintiff's claim against Defendants.

## E. Grievance #01-23-066

The next grievance at issue is grievance #01-23-066 dated January 9, 2023 (Doc. 49, pp. 6–7, 14–15; Doc. 64, pp. 8–9; *see also* Doc. 49-1, pp. 82–87). In this grievance, Plaintiff complains that he began suffering from a persistently sore throat in June 2022 (Doc. 49-1, pp. 84–85). He saw NPs Luking and Wise the following month and they determined that he had enlarged lymph nodes and ordered blood tests, which came back with some abnormalities. Plaintiff complained that, as of January 10, 2023, he had yet to receive any type of follow-up care despite numerous requests. Specifically, he states that he was taken to nurse sick call in September 2022, however, the nurse refused to refer him to see the doctor or nurse practitioner because he had not signed the consent form to be seen. He states that he subsequently submitted at least 17 request slips for medical care for the "constant pain" in his "back, kidneys, groin, leg, skin, and throat" between September 5, 2022, and January 2, 2023. He received thirteen nurse sick call passes but was only seen twice. The first was on October 3, 2022, regarding his "skin complaint." The second was on October 31, 2022, "for pain," but the nurse did not refer him to see the nurse

practitioner. He states that he received a call pass on January 3, 2023, to see NP Luking, but when he got to the Health Care Unit, a correctional officer told him that his "call pass was cancelled because Nurse Practitioner Luking did not want to see [him]."[2] Plaintiff asks to be seen for proper diagnosis, care, and treatment for his various medical issues.

Defendants argue that this grievance was not fully exhausted because it was not timely filed (Doc. 49, p. 15). The grievance officer rejected the grievance as it related to the incident dates in June, July, and August of 2022, because the grievance was filed more than 60 days after those incidents (*Id.*; *see also* Doc. 49-1, pp. 82, 83). The Court, however, believes it was improper for the facility to reject this grievance for being untimely. Plaintiff was not complaining about or challenging the care he received in June, July, or August of 2022 (*see* Doc. 49-1, pp. 84–85). Rather, he appears to be grieving the ongoing failure to provide him with any follow-up care since August 2022 (*see id.*). Because this portion of Plaintiff's grievance was challenging a continuing wrong, as opposed to a particular incident, it was not untimely just because the first occurrence of the wrong occurred more than 60 days before the grievance was filed. *See Wilder v. Sutton*, 310 F. App'x 10, 15 (7th Cir. 2009); *Turley v. Rednour*, 729 F.3d 645, 650 (7th Cir. 2013).

That being said, the Court agrees with Defendants that this grievance is insufficient to cover Plaintiff's claims against Defendants Luking and Wise. With respect to Defendant Wise, her name was included in the grievance only as part of the

---

[2] Plaintiff submitted the medical record from January 3, 2023 (Doc. 64, p. 61). It contains a note from Defendant Luking that says: "Individual scheduled for NP Line for furlough [follow-up]. However, individual did not go on these furloughs. No need to see." (*Id.*).

background information that Plaintiff provided about his medical care. Plaintiff did not

complain about any of the care Wise provided or say anything about her that suggested

she was the target of this grievance. As for Defendant Luking, Plaintiff suggests that she

was partly to blame for the fact that he had not received any follow-up care. Specifically,

he stated in the grievance that his call pass to see NP Luking on January 3, 2023, was

cancelled because she "did not want to see [him]." (Doc. 49-1, p. 85). Plaintiff did not,

however, include any allegation in the amended complaint about NP Luking's conduct

on January 3, 2023 (*see* Doc. 15). In other words, the conduct that Plaintiff complains about

in this grievance is not part of the facts underlying his claim against NP Luking.

Consequently, this grievance cannot serve to exhaust any portion of his claim against NP

Luking.

### F.  Grievance # 1753-06-23

The final grievance at issue is grievance # 1753-06-23 dated May 18, 2023, and filed

at Pinckneyville (Doc. 49, pp. 7, 15–16; Doc. 64, p. 9; *see also* Doc. 49-1, pp. 53–59). In this

grievance, Plaintiff complains that he should not have been transferred from Lawrence

to Pinckneyville because he had a medical hold (Doc. 49-1, pp. 57–58). He states that he

still needs to be seen by a neurosurgeon and still needs a biopsy of the mass on his head.

He then provides a brief summary of the issues and delays that he has had with his

medical care. Specifically, he says that NPs Luking and Wise ordered a stool sample,

throat swab, and blood tests in February 2023, but due to "the deliberate delay by Nurse

Fison," the tests were not done in the days that followed. On April 11, 2023, after

"consistent complaints" to nurses about his throat, back, and arm/hand pain, he was

finally referred to see NP Luking, who confirmed that the tests she ordered back in February still had not been done. Those tests were completed eight days later on April 19th. On April 23rd, Plaintiff asked for an appointment to follow-up on the test results. However, he was then transferred to Pinckneyville before he had a follow-up and without knowing the results of the tests. The remainder of the grievance is about the medical and dental care that Plaintiff received after he arrived at Pinckneyville.

While this grievance arguably covers some of Plaintiff's allegations in this case, it was not fully exhausted before Plaintiff filed his amended complaint. Plaintiff submitted this grievance on May 18, 2023, only 13 days before he filed his amended complaint. The ARB did not issue its decision until August 23, 2023 (Doc. 49-1, p. 53). The law is clear: a prisoner must exhaust their claims *before* filing suit (or in this case, the amended complaint); exhausting while the litigation is already underway will not suffice. 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions . . . by a prisoner . . . until such administrative remedies as are available are exhausted."). *See also Woodford v. Ngo,* 548 U.S. 81, 88, 93 (2006) (holding that "complet[ing] the administrative review process" is "a precondition to [a prisoner] bringing suit in federal court"); *Chambers v. Sood*, 956 F.3d 979, 981 (7th Cir. 2020) ("The [PLRA] requires *pre-suit* exhaustion; pursuing administrative remedies while litigation is underway does not suffice."); *Ford v. Johnson*, 362 F.3d 395, 398 (7th Cir. 2004) ("[E]xhaustion must precede litigation."). Because Plaintiff filed his amended complaint before this grievance went through every step of the grievance, it cannot serve to exhaust Plaintiff's claim against Defendants Luking and Wise.

In sum, none of the grievances discussed by the parties in their briefs are sufficient to exhaust Plaintiff's claim against Defendants Luking and Wise. Therefore, Defendants' motion for summary judgment on the issue of exhaustion (Doc. 48) is granted.

## PLAINTIFF'S MOTION FOR LEAVE TO AMEND THE COMPLAINT

Pursuant to the Initial Scheduling Order, motions to amend the complaint were due by April 23, 2024 (Doc. 42). Plaintiff's motion was not filed until April 18, 2025 (Doc. 68), almost a year after his deadline for amending had elapsed.

A motion for leave to amend a complaint is generally evaluated under Federal Rule of Civil Procedure 15(a)(2), which provides that courts "should freely give leave when justice so requires." *Cage v. Harper*, 42 F.4th 734, 743 (7th Cir. 2022). However, when the motion to amend is filed after the deadline for amending the pleadings in the scheduling order has expired, like Plaintiff's motion here, then Rule 16 also comes into play. *See Cage*, 42 F.4th at 743; *Adams v. City of Indianapolis*, 742 F.3d 720, 734 (7th Cir. 2014) (citing *Alioto v. Town of Lisbon*, 651 F.3d 715, 719 (7th Cir. 2011)). Rule 16(b)(4) provides that the scheduling order—including the deadline to amend the pleadings—can only be modified "for good cause and with the judge's consent." FED. R. CIV. P. 16(b)(4). Therefore, in deciding a motion for leave to amend filed after the expiration of the amendment deadline, the district court may consider whether "the heightened good-cause standard of Rule 16(b)(4)" has been satisfied before considering whether an amendment should be permitted under Rule 15. *Cage*, 42 F.4th at 743 (quoting *Alioto*, 651 F.3d at 719). *See also* FED. R. CIV. P. 6(b)(1)(B) (requiring a showing of "good cause" and "excusable neglect" to extend a deadline after it expires).

In determining whether good cause exists, "the primary consideration for district courts is the diligence of the party seeking amendment." *Cage*, 42 F.4th at 743 (quoting *Alioto*, 651 F.3d at 720). *See also* FED. R. CIV. P. 16, Advisory Committee Note (1983 amendment) ("the court may modify the schedule on a showing of good cause if it cannot reasonably be met despite the diligence of the party seeking the extension."). Additionally, leave to amend under Rule 15 may be denied based on undue delay, amongst other things. *Mulvania v. Sheriff of Rock Island Cty.*, 850 F.3d 849, 855 (7th Cir. 2017) (quoting *Arreola v. Godinez*, 546 F.3d 788, 796 (7th Cir. 2008)).

In this instance, Plaintiff's motion is a year late. As best the Court can tell, Plaintiff never asked prior to filing his motion to amend to extend the deadline to amend his complaint (*see* Docs. 51, 54, 56, 60, 61). Plaintiff did not offer any explanation as to why he was unable to meet the original deadline or why he never formally asked to extend (or re-establish) the deadline for amending the complaint (*see* Doc. 68). Consequently, he has failed to establish good cause for the late amendment and his motion is denied. *See Adams*, 742 F.3d at 734 (affirming denial of plaintiffs' motion for leave to amend complaint and finding of no good cause where motion was filed six months after the deadline for amending the pleadings and plaintiffs did not move to extend the deadline before it expired or otherwise bring the approaching deadline to the judge's attention).

<u>CONCLUSION</u>

Plaintiff's motion for leave to amend the complaint (Doc. 68) is **DENIED.** The motion for summary judgment on the issue of exhaustion filed by Defendants Carissa Luking and Melissa Wise (Doc. 48) is **GRANTED**. This action is DISMISSED without

prejudice due to Plaintiff's failure to exhaust. The Clerk of Court is **DIRECTED** to enter

judgment and close this case on the Court's docket.

     **IT IS SO ORDERED.**

     **DATED: August 21, 2025**

                                      **s/ Mark A. Beatty** _____
                                      **MARK A. BEATTY**
                                      **United States Magistrate Judge**

<u>NOTICE TO PLAINTIFF</u>

Plaintiff is advised that this is a final decision ending his case in this Court. If Plaintiff wishes to contest this decision, he can appeal to the Seventh Circuit by filing a notice of appeal in the district court *within 30 days* of the entry of judgment. FED. R. APP. P. 4(a)(1)(A). This deadline can be briefly extended upon a motion demonstrating excusable neglect or good cause. FED. R. APP. P. 4(a)(5)(A), (C). *See also Sherman v. Quinn*, 668 F.3d 421, 425 (7th Cir. 2012) (explaining the good cause and excusable neglect standards); *Abuelyaman v. Illinois State Univ.*, 667 F.3d 800, 807 (7th Cir. 2011) (explaining the excusable neglect standard).

Plaintiff also has the option—prior to filing a notice of appeal—of filing a post-judgment motion under Rule 59(e) or Rule 60 asking the undersigned to reconsider the judgment. Any such motion, so long as it is in proper form and timely filed, will stop the clock for filing a notice of appeal until the district court has decided the motion. FED. R. APP. P. 4(a); *Robinson v. Sweeny,* 794 F.3d 782, 783 (7th Cir. 2015). To be "proper," the motion must state the grounds for relief from the adverse judgment. *Robinson*, 794 F.3d at 783.[3] To be timely, the motion must be filed within 28 days of the entry of judgment, and that deadline *cannot* be extended. FED. R. APP. P. 4(a)(4)(A)(iv), (vi); FED. R. CIV. P. 59(b); FED. R. CIV. P. 6(b)(2); *Banister v. Davis*, 590 U.S. 504, 507 (2020). Once the motion is ruled on, the 30-day clock to file a notice of appeal will begin anew. *Banister*, 590 U.S. at

---

[3] *Accord Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 826 (7th Cir. 2014) (motion will toll time to appeal so long as it contains an identifiable and substantive reason for reconsidering); *Elustra v. Mineo*, 595 F.3d 699, 707 (7th Cir. 2010) (in order to toll time for filing notice of appeal, motion must comply with Rule 7.1(b)(1) and "state with particularity the grounds for seeking the order" and "the relief sought").

508 (citing FED. R. APP. P. 4(a)(4)(A)(iv)).

The current cost of filing an appeal with the Seventh Circuit is $605.00. The filing fee is due at the time the notice of appeal is filed. FED. R. APP. P. 3(e). If Plaintiff cannot afford to pay the entire filing fee up front, he must file a motion for leave to appeal *in forma pauperis* ("IFP motion") along with a recent statement for his prison trust fund account. *See* FED. R. APP. P. 24(a)(1)(C). The IFP motion must set forth the issues Plaintiff plans to present on appeal. *See* FED. R. APP. P. 24(a)(1)(C).